COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| A.S., | § | No. 08-12-00255-CV |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 65th Judicial District Court |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC#2011CM838) |
| | § | |

**O P I N I O N**

A.S. ("A.S." or Appellant") appeals the involuntary termination[1] of his parental rights as to D.M., a minor child. [2] In five issues, A.S. argues that the evidence was legally and factually insufficient to support termination of parental rights pursuant to: (1) Texas Family Code §§ 161.001(1)(D) and (E); (2) Texas Family Code § 161.001(1)(N); (3) Texas Family Code § 161.001(1)(O); (4) Texas Family Code § 161.001(1)(Q); and (5) on best interest grounds. We affirm.

**PROCEDURAL BACKGROUND**

The original petition in this case was filed on February 7, 2011. In February 2011, the trial court convened an adversary hearing under Chapter 262 of the Texas Family Code,[3] entered

---

[1] Appeals from a judgment terminating parental rights are accelerated. *See* TEX.R.APP.P. 28.4. The Texas Supreme Court has determined that an appellate court should dispose of these appeals within 180 days after the notice of the appeal is filed. TEX.R.JUD'L ADMIN 6.2(a). The Court appreciates the efforts of counsel for Appellant and the Texas Department of Family and Protective Services in filing their respective briefs in a timely manner in this super-accelerated format.

[2] Pursuant to TEX.R.APP. P. 9.8, we shall refer to the subject child as "D.M.," the subject child's father as "A.S.," the subject child's mother as "C.M.," D.M.'s siblings "J.M." and "Ci.M.," and A.S.'s common-law-wife as "L.R."

[3] Referred to herein as "the Family Code."

temporary orders for the care and custody of the minor children D.M., J.M. and Ci.M., and named the Texas Department of Family and Protective Services ("the Department") as temporary managing conservator. Prior to the final hearing, the parties met and reached a mediated settlement agreement as to C.M., which did not require termination of her parental rights. The settlement agreement was later approved by the trial court.

The Department sought termination of A.S.'s parental rights at a trial held on August 1, 2012. [4] Following the bench trial on August 3, 2012, A.S. filed his notice of appeal. On August 8, 2012, the trial court found clear and convincing evidence to support termination on each of the grounds alleged, and that termination was in the best interests of the minor child D.M. The order appointed the Department as the children's permanent managing conservator and named C.M. possessory conservator.

## FACTUAL BACKGROUND

D.M. was born in 2010, and was one year old at the time of the trial. When he was born, both D.M. and C.M. tested positive for marijuana and crack cocaine. Priscilla Fonseca ("Ms. Fonseca") was the caseworker assigned to the case by the Department. She testified that the minor children, including D.M., were placed in foster case because of C.M.'s negligent supervision of J.M. and Ci.M., and for medical neglect of D.M. C.M. had been residing at Aliviane Drug Treatment Center ("Aliviane") and left the children at Aliviane for longer than twenty-four hours without returning. Ms. Fonseca testified that the children suffered the effects of C.M.'s substance abuse for years while they were with her. At that time, A.S.'s location was unknown to the Department and A.S. was not involved in the in-home services case. The

---

[4] The court also terminated the parental rights of the respective fathers of Ci.M. and J.M. Only A.S. appealed.

Department located A.S. in March of 2011. Ms. Fonseca testified that when she told A.S. that D.M. was in the temporary managing conservatorship of the Department, he "wanted a paternity test" because C.M. had relationships with multiple men. A.S. did not ask where D.M. was placed or request visitation.

According to A.S., he had a brief relationship with C.M. and was not advised that she was pregnant with D.M. until seven months into the pregnancy. A.S. learned of the pregnancy from C.M.'s uncle, and that C.M. told her grandmother that D.M. was A.S.'s child. The DNA test results established A.S. as the biological father of D.M. in July of 2012.

Ms. Fonseca stated that she scheduled meetings with A.S. in May and June of 2011, but he did not appear and failed to contact her. A.S. did not provide the Department with a schedule indicating when he would be in town. The Department ultimately prepared three Family Service Plans ("Service Plan"), pursuant to Section 262.103 of the Family Code, which required A.S., in part, to present himself to the court and to remain in contact with the Department. The court ordered A.S. to comply with the Service Plans.

At the time D.M. was born, A.S. was employed as a truck driver. A.S. first had contact with D.M. approximately two-and-a-half months after D.M. was born. Since that time, A.S. never saw, visited, or spoke to D.M. When asked at trial why he did not have contact with D.M., A.S. stated that he was "on the road most of the time" and that A.S.'s family "didn't want me to [sic] close to [C.M.'s] family" because "they're nothing but drug users and alcoholics."

Since D.M.'s birth A.S. has not provided financial support for D.M. A.S. testified that while his family has purchased items for D.M., they did not provide these items to him, fearing that C.M. would sell them. A.S. testified that he did not provide any relative placements for D.M.

3

when he was first contacted by the Department because he was unsure of paternity. He further testified that C.M. has asked him for money but that he "wasn't going to give her money." A.S. admitted that he knew C.M. had been abusing alcohol and drugs, including marijuana and crack cocaine.

Ms. Fonseca testified that A.S. was incarcerated for "assaults on past girlfriends." One of the victims of the assaults was L.R. Ms. Fonseca testified that there were several protective orders against A.S. filed by L.R. and another woman.[5] A.S. testified that he pled guilty to various charges "because I was already tired with all the postponements."

A.S. stated that was given a seven year sentence on a 2009 assault, and another seven year sentence to run concurrently for a 2010 assault. A.S. admitted to: (1) a theft of property conviction for theft from a Target store for which he received a 180 day jail sentence; (2) a conviction of the state jail felony of criminal mischief for which he was sentenced to one year in TDCJ, to run concurrently with his other sentences; (3) a conviction of the third degree felony of "Assault Causes Bodily Injury Family/Household" for which he was sentenced to seven years in TDCJ, to run concurrently; (4) and a conviction of the third degree felony of "Assault Family/Household Member with Previous Conviction" against L.R. for which he was sentenced to seven years in TDCJ, to run concurrently with other sentences. Another exhibit introduced at trial showed an agreed ten-year protective order against A.S. by another woman, M.P. According to A.S., his earliest parole date is February of 2013, but he has no certain release date.

Ms. Fonseca noted that prior to his incarceration, A.S.: (1) failed to visit D.M.; (2) failed to pay any support for D.M.; (3) did not ask for placement of D.M.; (4) did not maintain contact with the Department; and (5) did not offer any relative placement options for D.M. A.S. testified

---

[5] A.S. disputed Ms. Fonseca's testimony.

4

that he called his initial caseworkers on various occasions. While he was incarcerated, a new Service Plan was prepared requiring A.S. to maintain contact with the Department and to inquire about D.M. A.S. wrote one letter to Ms. Fonseca in July 2012, but made no further written or verbal inquires about D.M.

A.S. conceded he has an anger problem, but that he had not attended any anger management classes despite his assault charges and protective orders, and that he did not sign up for available anger management classes while in jail.

In March of 2012, while he was incarcerated, A.S., for the first time, provided a family placement option for D.M.[6] A.S. proposed L.R., whom Ms. Fonseca initially believed was A.S.'s girlfriend, but for whom A.S. had no contact information. Ms. Fonseca testified that A.S. wanted to wait and see if paternity was established before L.R. was considered for placement. After paternity was established in July 2012, A.S. again offered L.R. as a possible placement, but claimed that L.R. was his common-law wife.[7] A.S. wanted L.R. as a placement, even though A.S. was no longer in a relationship with L.R., because she was financially able to care for D.M. However, A.S. conceded that L.R. had never met D.M. The Department conducted a home visit to L.R.'s residence, but determined that D.M. would not be placed with L.R. because: (1) there was no relationship between D.M. and L.R.; (2) there was "[a] lot of domestic violence in the home" between A.S. and L.R., including the physical altercations which led to A.S.'s incarceration; (3) L.R. could only care for one child; and (4) the Department did not want to separate D.M. from his siblings. A.S. also proposed B.S., the mother of some of his other

---

[6] A.S. claimed that he gave placement options to the Department prior to his incarceration, however the trial record reflects that he did not do so until after he was incarcerated.

[7] A.S. testified that L.R. had been his common-law wife for three and a half to four years, but that he had been living with M.P. following an argument with L.R. so that A.S. "wouldn't pick up another case."

children, as a possible placement, but wanted to talk to B.S. before he provided her contact information to the Department. A.S. admitted that none of the people he proposed as placements for D.M. had ever met D.M.

Throughout the pendency of the case, D.M. remained in foster care with his siblings. At the time of trial, a home study was being conducted on maternal cousins for potential placement of the children. Ms. Fonseca and the Court Appointed Special Advocate ("CASA") for the children, Norma Montes ("Ms. Montes"), both felt it was in the best interests of the children for them to remain together. Ms. Montes testified that D.M. was non-verbal and unable to express his desires. Ms. Montes testified that A.S. was aware that D.M. could be his son and that A.S. left D.M. with C.M., who A.S. knew was involved with drugs. Ms. Montes further testified that A.S. should have done more if he had concerns about D.M. Ms. Fonseca testified that A.S. cannot provide a safe environment for D.M. and that he has never established a relationship with D.M.

A.S. also agreed that D.M. should not be separated from his siblings. While conceding that he has never supported D.M., A.S. insisted that he has not done anything, or failed to do anything, contrary to the best interests of D.M.[8]

## DISCUSSION

In five issues, A.S. argues that the evidence was legally and factually insufficient to support termination of parental rights pursuant to: (1) Texas Family Code §§ 161.001(1)(D) and (E); (2) Texas Family Code § 161.001(1)(N); (3) Texas Family Code § 161.001(1)(O); (4) Texas Family Code § 161.001(1)(Q); and (5) on best interest grounds.

### Standard of Review

---

[8] A.S. admitted that he had seven children with three different women. He testified that he pays child support, but not while incarcerated.

In a proceeding to terminate parental rights, the petitioner must demonstrate by clear and convincing evidence that: (1) the parent committed one or more of the acts specifically set forth in Texas Family Code § 161.001(1) as grounds for termination; and (2) that termination is in the best interest of the child. *See* TEX.FAM.CODE ANN. § 161.001 (West Supp. 2012). "Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2008); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)(contrasting the standards applied in termination proceedings and the standards applied in modification proceedings). We strictly scrutinize termination proceedings and construe any statutes authorizing involuntary termination in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); TEX.FAM.CODE ANN. § 161.001(1); *In re D.M.*, 58 S.W.3d 801, 813 (Tex.App.--Fort Worth 2001, no pet.); *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.--San Antonio 2000, no pet.).

When reviewing legal sufficiency challenges to termination findings, we consider all of the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F. C.*, 96 S.W.3d at 266. We give deference to the fact finder's conclusions and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.*; *In re J.F. C.*, 96 S.W.3d at 266. We

disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been

incredible, but we do not disregard undisputed facts.  *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*,

96 S.W.3d at 266.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact

finder's findings, and we cannot supplement such judgment with our own.  *In re H.R.M.*, 209

S.W.3d 105, 108 (Tex. 2006).  "If, in light of the entire record, the disputed evidence that a

reasonable factfinder could not have credited in favor of the finding is so significant that a

factfinder could not reasonably have formed a firm belief or conviction, then the evidence is

factually insufficient."  *In re H.R.M.*, 209 S.W.3d at 108, *quoting In re J.F.C.*, 96 S.W.3d at 266.

**Statutory Grounds for Termination - Sections 161.001(1)(D) and (E)**

A.S. first asserts that the evidence is legally and factually insufficient to support

termination of his parental rights under Sections 161.001(1)(D) and (E) of the Family Code.  A.S.

contends that there is no evidence that he knew or could have known that D.M. was being

medically neglected.  A.S. further argues that he did not know the child was biologically his, and

that "it cannot be said that [A.S.] left the children in the care of persons likely to endanger the

children based on what was known to him at the time that he left the home."

Sections 161.001(1)(D) and (E) provide that the court may order termination of the

parent-child relationship if the court finds clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or
> surroundings which endanger the physical or emotional well-being of the child;
> (E) engaged in conduct or knowingly placed the child with persons who engaged in
> conduct which endangers the physical or emotional well-being of the child;

TEX.FAM.CODE ANN. § 161.001(1)(D) and (E).

Both (D) and (E) use the term "endanger."  "To endanger" means to expose a child to loss

8

or injury or to jeopardize a child's emotional or physical health.   *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Tex. Dep't of Family and Protective Services*, 312 S.W.3d 608, 616–17 (Tex.App.--Houston [1st Dist.] 2009, pet. denied); *Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex.App.--Houston [1st Dist.] 2002, no pet.), *citing Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).   A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards.   *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist.] 2005, no pet.).   The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment . . . . "   *Boyd*, 727 S.W.2d at 533.   While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or cause actual harm; rather, it is sufficient if the conduct endangers the child's emotional well-being.   *Id.*; *In re U.P.*, 105 S.W.3d 222, 233 (Tex.App.--Houston [14th Dist.] 2003, pet. denied); *Robinson*, 89 S.W.3d at 686.   It is not necessary that the conduct be directed at the child or that the child suffers injury, or even that the conduct constitutes a concrete threat of injury to the child.   *See In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex.App.--San Antonio 2000, pet. denied).   Thus, the court's inquiry encompasses acts that endanger a child's physical or emotional well-being, or both.   *See Boyd*, 727 S.W.2d at 534.

Section (D) requires proof of endangerment which means to expose to loss or injury, or to jeopardize a child's emotional or physical health.   *Castaneda v. Tex. Dep't. of Protective and Regulatory Servs.*, 148 S.W.3d 509, 521-22 (Tex.App.--El Paso 2004, pet. denied), *citing Boyd*, 727 S.W.2d at 533.   While endangerment means more than a threat of metaphysical injury or the

9

possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child suffer actual injury. *Castaneda,* 148 S.W.3d at 522; *Doyle v. Tex. Dep't. of Protective and Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Castaneda*, 148 S.W.3d at 522. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. *Id.*; *see In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ)("environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d at 502. The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.*

The relevant inquiry for a subsection (E) termination is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.--Fort Worth 2003, no pet.). It is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d at 125. Endangerment of a child's well-being may be inferred from parental misconduct, including conduct that subjects the child to a life of uncertainty and instability. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex.App.--Fort Worth 2004, pet. denied). The parent-child relationship, and efforts to improve

or enhance parenting skills, are relevant in determining whether a parent's conduct results in endangerment under subsection (E). *See In re D.T.*, 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied).

Because the focus under (D) or (E) is the conduct of the parent, evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *In re J.T.G.*, 121 S.W.3d at 133.

However, there are some distinctions in the application of subsections (D) and (E). Knowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment under Section 161.001(1)(D), however it is not a prerequisite to a showing of a parental course of conduct which endangers a child under Section 161.001(1)(E). *See In the Interest of Stevenson*, 27 S.W.3d 195, 201-03 (Tex.App.--San Antonio 2000, pet. denied). Furthermore, termination under Section 161.001(1)(D) is permitted "because of a single act or omission." *See In re R.D.*, 955 S.W.2d 364, 367 (Tex.App.--San Antonio 1997, pet. denied). Conversely, termination under (E) requires a conscious course of conduct by the parent. *See In re K.M.M.*, 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.); *In re J.W.*, 152 S.W.3d 200, 205 (Tex.App.--Dallas 2004, pet. denied).

Reviewing the evidence presented in the case, A.S., by his own admission, knew that C.M. was seven months pregnant with D.M. and that he was purportedly the father. Yet A.S. only met D.M. when D.M. was two months old, and has never seen D.M. since. A.S.'s excuse was that he was on the road most of the time. The evidence also established that A.S. knew C.M. was abusing alcohol, using marijuana, and "smok[ing] crack cocaine." The record indicates that D.M. tested positive for marijuana and cocaine at his birth. A.S. conceded that he did not seek custody or

11

conservatorship over D.M.

A.S. did not challenge the evidence presented that C.M. medically neglected D.M., which led to D.M.'s placement in foster care. A.S. did not challenge Ms. Fonseca's testimony that the children suffered the effects of C.M.'s substance abuse, which endangered their emotional and physical well-being for years while they were with her. A.S. did not challenge the evidence of his criminal convictions, including two family violence assaults against household members, resulting in his incarceration. A.S. did not challenge Ms. Fonseca's testimony that, apart from writing a single letter to her inquiring about D.M., A.S. made no additional inquiries about D.M. No evidence was presented that A.S. made any attempt to improve his parenting skills. While A.S. testified that he had anger problems and that anger management courses were available, he did not avail himself of these programs. A.S. provided no financial or other support for D.M.

Considering all of the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true," *In re J.P.B.*, 180 S.W.3d at 573, we conclude that a reasonable fact finder could have formed a firm belief or conviction that A.S. endangered the emotional and physical well-being of D.M. through A.S.'s course of conduct, including his failures to act. We find the evidence presented legally sufficient to support termination under Sections 161.001(1)(D) & (E). In reviewing the entire record and evidence presented, and giving due deference to the evidence that the fact finder could reasonable have found to be clear and convincing, *See In re J.F.C.*, 96 S.W.3d at 266, we conclude that the evidence is factually sufficient to support termination under Sections 161.001(1)(D) & (E). Any disputed evidence presented was not such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at

12

266. A.S.'s first issue is overruled.

Because we conclude that the evidence is legally and factually sufficient to support the trial court's finding under Sections 161.001(1)(D) & (E) as challenged in Issue One, we need not address the challenges raised by A.S. in Issues Two, Three and Four. *See* TEX.FAM.CODE ANN. § 161.001(1); *In re A.V.*, 113 S.W.3d at 362.

## Best interests of the child

A.S.'s fifth issue is that the evidence was legally and factually insufficient to support the termination of his parental rights under the best interest of the child analysis.

The Texas Supreme Court has recognized a number of factors used for best-interest determinations. *See Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 372 (footnotes omitted); *M.C.*, 300 S.W.3d at 311. The *Holley* factors are not exhaustive. *M.C. v. Texas Dept. of Fam. & Prot. Svc.*, 300 S.W.3d 305, 311 (Tex.App.--El Paso 2009, pet. denied). No single factor is controlling, and the fact finder is not required to consider all of them. *M.C.,* 300 S.W.3d at 311. Undisputed evidence of a single factor may be sufficient to support a finding that termination is in the best interest of a child. *Id.*

13

*Desires of the child.* D.M. is very young, having been one year old at the time of the trial, and is non-verbal. The record is silent regarding D.M's desires. However, the fact that D.M. has spent virtually no time with A.S. may be considered as part of this factor. *See In re U.P.*, 105 S.W.3d at 230. A.S. met D.M. on exactly one occasion following D.M.'s birth, and has never visited D.M. during the case. Certainly, the lack of contact between A.S. and D.M. supports a conclusion that there is no emotional bond between them. *See In re C.N.S.*, 105 S.W.3d 104, 106 (Tex.App.--Waco 2003, no pet.). This factor supports termination.

*The emotional and physical needs of the child now and in the future, and the emotional and physical danger to the child now and in the future.* A.S. contends that there is no evidence of past or future danger to D.M. by A.S., or any allegations involving A.S.'s six other children. However, evidence of past misconduct or neglect is permissible as an inference that a parent's future conduct may be measured by their past conduct. *See May v. May*, 829 S.W.2d 373, 377 (Tex.App.--Corpus Christi 1992, writ denied). A parent's inability or unwillingness to provide adequate care for his children, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex.App.--Fort Worth 2003, no pet.). Without stability, income, or home, a parent is unable to provide for a child's emotional and physical needs. *Id.* at 894.

Further, while there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship; *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006)(per curiam), the focus is on the best interest of the child - not the best interest of the parent. *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex.App.--Dallas 1995, no writ). A parent's current and future incarceration at the time of trial is relevant to that

14

parent's ability to meet the child's present and future physical and emotional needs. *See In re M.D.S.*, 1 S.W.3d 190, 200 (Tex.App.--Amarillo 1999, no pet.). This is not dispositive, but only a factor for best interest. *In the interest of C.T.E.*, 95 S.W.3d 462, 466 (Tex.App.--Houston [1st Dist.] 2002, pet. denied).

There is nothing in the record indicating that D.M. has any special physical, emotional or psychological needs. The unchallenged evidence in the case established that: (1) A.S. has not seen, visited, or spoken to D.M. since the single time he met D.M.; (2) A.S. has not provided financial support for D.M. since D.M. was born; (3) A.S. is presently incarcerated, having been sentenced to seven years of confinement for multiple offenses, including two assaults, which involved women with whom A.S. was involved; (4) A.S. testified he had anger problems and that while anger management courses were available, he did not avail himself of these programs; (5) the only placement A.S. offered for D.M. was in the home of L.R., whom A.S. was convicted of assaulting, and who had no relationship with D.M.

The record supports an inference that A.S.'s course of misconduct before and throughout this case would continue into the future. *See generally*, *May*, 829 S.W.2d at 373. Further, A.S.'s continued lack of contact with D.M., lack of support of D.M., and A.S.'s sentence and incarceration established that A.S. is unable to meet D.M.'s emotional or physical needs, presently or in the future. *In re C.A.J.* 122 S.W.3d at 893; *In re M.D.S.*, 1 S.W.3d at 200; *In re S.M.L.*, 171 S.W.3d at 479 (explaining that because when a parent is incarcerated, he is absent from a child's daily life and is unable to provide support, a parent's pattern of intentional criminal activity that exposes the parent to incarceration is conduct that can negatively impact a child's living environment and emotional well-being). The trial court could have also concluded that A.S.

15

could not offer stability or permanence to D.M. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex.App.--Fort Worth 2002, pet. denied). These factors favor termination.

*The parental abilities of the individuals seeking custody. The programs available to assist these individuals to promote the best interest of the child.* A.S. does not address these factors in his brief. The record does indicate that while A.S. recognizes that he has an anger problem, he has failed to take advantage of available programs. Certainly A.S.'s substantial lack of involvement in D.M.'s life, as well as A.S.'s lack of action in seeking custody or conservatorship of D.M. though A.S. knew D.M. resided in the home of a known drug abuser, raised significant doubts as to A.S.'s parental abilities. Such information was certainly relevant to and supportive of the termination determination.

*The plans for the child by these individuals or by the agency seeking custody. The stability of the home or proposed placement.* A.S. generally argues these factors together in his brief. A.S. contends that the Department does not have a concrete permanency plan for D.M. or his siblings, and that terminating A.S.'s parental rights would not further the Department's stated goals of working with C.M. in helping her gain managing conservatorship rights and potentially placing the children with relatives.

The evidence in the case was that A.S. proposed that D.M. live with L.R. who: (1) had no relationship with D.M.; (2) had a violent relationship with A.S.; (3) could only care for one child; and (4) whom A.S. planned on reuniting with once he was released from prison. A.S. claimed that he would support D.M. following his release from prison but had not done so previously. He also claimed that he would "be there" for D.M., despite only having met him once. None of the people A.S. proposed as placements for D.M. had ever met D.M. The Department and CASA

16

both testified that D.M. should remain with his other siblings, with whom he was strongly bonded to. A.S. agreed that D.M. remaining with his siblings was in D.M.'s best interest. Both the Department and A.S. agree that separating D.M. from his siblings is not in the best interests of the child. These factors are, at best, neutral.

*The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one. Any excuse for the acts or omissions of the parent.* A.S. does not address either of these factors in his arguments. When asked at trial why he did not have contact with D.M., A.S. stated that he was "on the road most of the time" and that A.S.'s family "didn't want me to [sic] close to her family" because "they're nothing but drug users and alcoholics." Since D.M.'s birth A.S. has not provided financial support for D.M. A.S. testified that while his family bought items for D.M., they did not provide these items to D.M., fearing that C.M. would sell them. A.S. did not testify that he, himself, had ever purchased anything for D.M. A.S. testified that he did not provide any relative placements for D.M. when he was first contacted by the Department because he was unsure of paternity. A.S. has admitted to anger issues, but did not take advantage of any programs available to him while incarcerated, and blames transfers in the prison system for his failure. A.S. is currently incarcerated for multiple crimes, including two assaults, one of which was committed against L.R., whom A.S. claims as his common-law wife, although he is subject to protective orders filed by L.R. and other women. Since D.M. was born, A.S. has seen him only once and has not made inquiries about him.

The trial court, as fact finder, was entitled to disbelieve some or all of A.S.'s excuses based on the evidence presented, and reasonably could have formed a firm belief or conviction that A.S had inadequate excuses for his actions and inactions. The trial court could also reasonably have

17

formed a firm belief and conviction that A.S.'s acts and omissions do not support an appropriate parent-child relationship. These factors favor termination.

Viewing the evidence in the light most favorable to the judgment for a legal sufficiency analysis and all of the evidence equally for a factual sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that the best interest of the child would be served by termination of A.S.'s parental rights. We find the evidence legally and factually sufficient to support the trial court's finding. Appellant's fifth issue is overruled.

## CONCLUSION

Having found legally and factually sufficient evidence to support termination under Sections 161.001(1)(D) & (E) and that termination is in for the best interest of the child, the judgment of the trial court is affirmed.


December 21, 2012

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

18